930 So.2d 1186 (2006)
LOUISIANA SAFETY ASSOCIATION OF TIMBERMEN SELF INSURERS FUND, Plaintiff-Appellee
v.
RUFINO'S PAINTING & CONTRACTORS, INC., Defendant-Appellant.
No. 40,620-CA.
Court of Appeal of Louisiana, Second Circuit.
May 19, 2006.
*1187 Gaudry, Ranson, Higgins & Gremillion, LLC, by Daniel A. Ranson, Gretna, for Appellant.
John T. Scott, West Monroe, for Appellee.
Before WILLIAMS, STEWART and GASKINS, JJ.
GASKINS, J.
The defendant, Rufino's Painting and Contractors, Inc. (Rufino's) appeals from a trial court judgment ordering the company to pay in excess of $31,000.00 in workers' compensation insurance premiums to its workers' compensation insurer, Louisiana Safety Association of Timbermen Self Insurers Fund (Timbermen). For the following reasons, we affirm the trial court judgment.

FACTS
The defendant is a painting and drywall company in the New Orleans area owned by Rufino and Wynonne Saavedra. The business is operated from their home and Mr. Saavedra is the supervisor, overseeing the daily operations of the company. Mrs. Saavedra is the bookkeeper. Rufino's has some employees that work exclusively for the company; much of the work is done by subcontractors.
Beginning in 1994, Rufino's contracted with Timbermen to provide workers' compensation insurance. The premiums were determined by the classification and number of workers insured. If subcontractors failed to provide certificates of insurance, they were insured under the contract with Timbermen. Mrs. Saavedra claimed that each month she furnished payroll information as well as information regarding certificates of insurance for the subcontractors. Each year, Timbermen audited the records to determine if the appropriate amount had been paid for the insurance premiums.
Timbermen hired a private audit service that sent an auditor to the office of Rufino's accountant to conduct the yearly audit. According to Rufino's, if the auditor needed additional information, such as the *1188 classification of employees, or certificates of insurance for subcontractors, Mrs. Saavedra would be contacted and she would supply the needed documentation. Rufino's contended that for subcontractors without insurance, the usual practice was to include 60 percent of the total amount paid to subcontractors as the cost of labor to be used in calculating the insurance premium. The remaining 40 percent of the price paid was attributable to materials, which had no bearing on the amount of workers' compensation insurance premiums owed.
A dispute arose over the amount of premiums due for 1998-2000. During those years, a different auditor, Burton Brunson, was assigned to the Rufino's account. Rufino's claimed that Mr. Brunson never requested additional documentation from Mrs. Saavedra. The company claimed that the auditor did not properly classify employees, improperly considered all of the amounts paid to uninsured subcontractors in computing the insurance premium, and failed to exclude amounts paid to employees and subcontractors who worked on projects for the Orleans Parish School Board (OPSB). The OPSB participated in an owner-controlled workers' compensation insurance plan and workers on the school board property were covered by that policy.
On September 20, 2002, Timbermen filed suit against Rufino's, claiming that it owed additional workers' compensation insurance premiums. The insurer also sought to recover interest and attorney fees in accordance with the contract of insurance.
Trial was held on December 7, 2004, and February 24, 2005. To establish its claim for additional premiums, Timbermen presented the testimony of James Parker, the collections manager with Timbermen. He had formerly served as an auditor with Louisiana Audit Service, the company hired by Timbermen to audit the Rufino's account. Mr. Parker testified regarding the procedures used in conducting audits and the amount owned by Rufino's in this case.
According to Mr. Parker, insureds are given notice of the intent to audit and are informed of the date the audit will take place. The insured is asked to meet on the audit date and to bring documents to be reviewed. He stated that, to his knowledge, those procedures have not changed since he left Louisiana Audit Service. Mr. Parker stated that the insured should obtain certificates of insurance from subcontractors when they are hired. In some instances, if an insured furnished a certificate of insurance for a subcontractor after the audit, credit was given.
Mr. Parker discussed the method of arriving at insurance premiums by classifying employees according to their work and then applying various insurance rates assigned to those classes. He stated that a "scopes manual" is used in classifying employees.
Mr. Parker stated that generally the insured will provide information regarding how much of the amount paid to a subcontractor is attributable to materials and how much to labor. The insurance premium is based upon the amount paid for labor. He said that there is a 50 percent cap on amounts paid to subcontractors for labor.
Mr. Parker stated that, according to the audit conducted by Mr. Brunson, Rufino's owed $5,322.37 in additional premiums for 1998, $18,145.40 for 1999, and $8,059.36 for 2000.
Mrs. Saavedra testified at trial that Timbermen began insuring Rufino's for workers' compensation claims in 1994 or 1995. She claimed that an auditor for Timbermen would conduct a premium audit each year by reviewing 1099 forms, the general payroll ledger, quarterly returns, payroll *1189 calculations, and names of employees. She stated that the auditor would visit the office of Rufino's accountant. Later, Mrs. Saavedra would furnish any additional information needed, upon request. Mrs. Saavedra complained that in 1998, 1999, and 2000, when Mr. Brunson was assigned to conduct the audit, she was never contacted to furnish additional information. She testified that she received final audits for 1998, 1999, and 2000, marked corrections on the reports and returned them to Timbermen. She said that several employees were unclassified and that she had certificates of insurance for some of the subcontractors, showing that they should not have been included in the premium calculation.
Mrs. Saavedra also contended that in 1999 and 2000, Rufino's did some work for the OPSB. She claimed that, because those workers were covered by the insurer of the OPSB while working on those projects, that portion of the payroll was to be excluded from the amounts used by Timbermen to compute workers' compensation premiums. Regarding subcontractors without insurance, Mrs. Saavedra claimed that prior auditors used 60 percent of the total amount paid to subcontractors without insurance as the labor sum used in calculating the insurance premium.
Mrs. Saavedra testified that, according to the usual procedure prior to 1998, when the company account was audited, she would only provide documentation when she was asked for it. She claimed that she did not see the 1998 audit report until June 7, 1999. She asserted that when she noticed what she perceived to be inaccuracies in the audit, she did not furnish any documentation to support her claims until 2002 because that was when the information was requested. However, she claimed that she corresponded with Timbermen to dispute the audit findings and that she made notations on the audit results to show the correct classification of employees and what she perceived to be the correct premium amounts. Also, she claimed that she attached certificates of insurance for some of the subcontractors who should have been excluded from the premium calculations.
Mrs. Saavedra claimed that she corresponded with Mr. Brunson in October 2001, and in January 2002. Mrs. Saavedra identified correspondence to Mr. Brunson in 2002 in which she claimed that she sent copies of the 2000 disbursement journal for subcontractors, breaking down the labor and material and noted which jobs were covered by the OPSB certificate of insurance. Mrs. Saavedra confirmed that she never personally met with Mr. Brunson. She asserted that, until Mr. Brunson did the audits, there was always a 60/40 split for the labor and materials for subcontractors. She testified that any failure on her part to submit sufficient information was attributable to not knowing when the audits were to be conducted. She reiterated that she waited for Mr. Brunson to request additional information from her.
Mrs. Saavedra identified a letter to Timbermen's attorney indicating that she thought a reaudit was being conducted, but that she was not aware of when that had been scheduled.
On rebuttal, Timbermen called Dana Denney to testify. Ms. Denney is employed by Timbermen in the audit department, handling problem audits. She stated that, regarding Rufino's objection to the audits for 1998, 1999, and 2000, the only documentation Mrs. Saavedra provided was her corrections on the audit report, indicating what she claimed to be the correct figures. Ms. Denney sent a letter to Louisiana Audit Service, asking that the defendant's audits for the years in question be reexamined, with the understanding *1190 that Mrs. Saavedra would be present for the reaudit. She stated that documents were faxed to Louisiana Audit Service, but she was not sure which documents they were.
Timbermen also called Burton Brunson to testify on rebuttal. Rufino's objection to his testimony was overruled. Mr. Brunson testified that he was employed by Louisiana Audit Services and did workers' compensation insurance audits. He stated that he audited the Rufino's account several times and always had difficulty getting cooperation from Mrs. Saavedra. He said that he scheduled audits by sending out a letter suggesting a time for the audit. If that time was not convenient, he would telephone to set up another time for the audit. According to Mr. Brunson, on three different occasions he set meetings with Rufino's accountant and Mrs. Saavedra, but Mrs. Saavedra never appeared. He claimed that she also failed to furnish sufficient documentation for the audits. He stated that she would furnish gross figures effectively saying what the audit should be, but provided no documentation. Mr. Brunson met only with Rufino's accountant who did not possess all the information needed to satisfactorily complete the audit.
Mr. Brunson stated that after 1997, he never saw Mrs. Saavedra and when she sent documentation, it was never the items that were requested. He testified that Rufino's had some employees that were possibly exempt from coverage, but he could never get Mrs. Saavedra to furnish documentation. Some of the requested information was on breakdowns of materials and labor. He stated that he needed a payroll of employees, amounts paid to subcontractors who did not have their own insurance, overtime figures, and information to determine which employees and subcontractors did what kind of work. Due to the lack of information, Mr. Brunson finally assigned all the workers to one category in order to complete the audit.
Mr. Brunson stated that he received letters from Mrs. Saavedra after she objected to the audit results. He denied that he also received disbursement journals for each of the listed subcontractors with breakdowns of materials and labor as claimed by Mrs. Saavedra. He stated that the enclosures with the letters were fragmentary and were insufficient to complete the audit.
Mr. Brunson was asked about the assertion that some of the subcontractors were covered by the OPSB insurance policy because they performed jobs on the school board property. He stated that, based on the information provided, he could not relate Rufino's payroll on the OPSB projects and payroll on other work. Regarding Rufino's request for a reaudit, he said that the auditing service never assigned him to do the work.
On March 28, 2005, the trial court rendered judgment in favor of Timbermen. The court ordered that Rufino's pay Timbermen $31,527.13, together with ten percent interest and $5,000.00 in attorney fees, subject to a credit of $5,426.26 already paid by Rufino's to the plaintiff. In reasons for judgment, the court essentially found that Mrs. Saavedra did not fulfill her obligation of supplying adequate documentation during the audit process.
The court stated that, according to the evidence, the standard operating procedure for conducting audits was that the auditor sent a notice to the insured that an audit would be conducted. At that time, the insured had the responsibility of providing all necessary documentation to support its position, including certificates of insurance. The court found that Mrs. Saavedra failed to fulfill this duty. The court further found that she did not provide documentation for the changes she *1191 claimed were necessary. The court found Mrs. Saavedra not to be a credible witness and found that her testimony was insufficient to support the changes she urged.
The court found the testimony of Mr. Brunson to be credible and supported Timbermen's position that Mrs. Saavedra failed to cooperate with the auditing process and that the company owed an additional amount for workers' compensation insurance premiums. Rufino's appealed the trial court judgment.

TIMBERMEN'S AUDIT RESULTS
Rufino's argues that the trial court erred in accepting as accurate the unsubstantiated audit results of Timbermen. According to Rufino's, the plaintiff had the burden of showing that its audit was accurate. Rufino's claims that Timbermen failed to carry this burden.
Rufino's makes numerous allegations regarding the procedures that should have been followed to conduct the audit and the information used to arrive at the premium owed. Specifically, Rufino's argues that Timbermen failed to properly classify employees, incorrectly calculated the amount paid to uninsured subcontractors to be used in computing insurance premiums, and erred in including amounts paid to subcontractors who were covered under the OPSB policy. These arguments are without merit.
The suit brought by Timbermen against Rufino's for collection of unpaid insurance premiums arises from a conventional obligation created by contract between the parties. A party who demands performance of the obligation must prove the existence of the obligation. La. C.C. art. 1831. Once the plaintiff meets the initial burden of establishing a prima facie case of the existence of the obligation by a preponderance of the evidence, the burden shifts to the defendant to come forth with sufficient evidence to rebut or cast doubt on the plaintiff's case. Louisiana Safety Association of Timbermen Self Insurers Fund v. Malone Lumber, Inc., 34,646 (La. App. 2d Cir.6/20/01), 793 So.2d 218, writ denied, 2001-2557 (La.12/7/01), 803 So.2d 973.
In the present case, Timbermen established the existence of the workers' compensation insurance contract and that, according to the audits conducted in 1998, 1999, and 2000, Rufino's owed an additional amount for insurance premiums. Rufino's then had a duty to rebut Timbermen's assertions. Based upon the evidence presented, Rufino's failed in that duty.
Through the testimony of its witnesses, including Mr. Parker and Mr. Brunson, Timbermen established that the amounts claimed were owed by Rufino's. Mr. Parker set forth the standard procedure for conducting audits. Rufino's argues in brief that Mr. Parker stated that procedures for conducting an audit required that, if additional information was needed, that it would be requested from the insured. The record shows that Mr. Parker stated that procedures required all documentation to be provided at the time of the audit and that, in some instances, if certificates of insurance for subcontractors were provided later, a credit might be given.
Rufino's contends that the classification of employees for calculation of premiums depends upon information furnished by the insured. Mr. Parker testified that the type of work that the employee does is examined and a "scopes manual" is used to determine the insurance premium rate to be charged. The record also shows that Mrs. Saavedra failed to timely respond to requests by Mr. Brunson to provide all pertinent information at the time of the audit.
Rufino's contends that there was no contradiction at trial of Mrs. Saavedra's testimony that the usual procedure regarding *1192 uninsured subcontractors was that 60 percent of the total amount paid was used as the cost of labor to calculate insurance premiums. We note that Mr. Parker testified that usually there was a 50 percent cap on the amounts attributed to labor paid to uninsured subcontractors. However, the record shows that Mrs. Saavedra failed to timely provide sufficient information regarding the breakdown of labor and materials paid to uninsured subcontractors or the categories of workers. Therefore, not only was the 50 percent cap not applied, but Mr. Brunson assigned all the workers to one category and the premium was calculated on that basis. According to his testimony, due to the lack of information provided, this was his only choice to complete the audit.
Rufino's claims that Mr. Brunson indicated at trial that the information regarding work done by subcontractors on the OPSB projects may have been sufficient to exclude those amounts from the insurance calculation. The record shows that this information was not timely furnished and that Mr. Brunson indicated that the documentation did not show how much of the labor was attributable to OPSB projects and how much was done by the subcontractors on other jobs that would have been covered by Timbermen.
Rufino's argues in brief that Mrs. Saavedra's revisions to the audit were not questioned at trial. On the contrary, the record shows that Mr. Brunson testified that the information furnished was fragmentary and did not support Rufino's claims. Contrary to the arguments made by Rufino's, there is a conflict between Mrs. Saavedra's testimony and that of Mr. Brunson and the others who testified on behalf of Timbermen. The decision of this case turns on a credibility determination made by the trial court.
An appellate court may not set aside a trial court's finding of fact in the absence of manifest error or unless clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989). Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The appellate review of fact is not completed by reading only so much of the record as will reveal a reasonable factual basis for the finding in the trial court, but if the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Rosell v. ESCO, supra; Louisiana Safety Association of Timbermen Self Insurers Fund v. Malone Lumber, Inc., supra.
When findings are based on determinations regarding the credibility of witnesses, the manifest errorclearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. But where such factors are not present, and a factfinder's finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can *1193 virtually never be manifestly erroneous or clearly wrong. Rosell v. ESCO, supra; Humphrey v. Balsamo, 40,200 (La.App. 2d Cir.11/8/05), 914 So.2d 1217. The record shows that the trial court was not manifestly erroneous or clearly wrong in determining that Mr. Brunson was a credible witness.
Based upon the testimony and the evidence in the record, Timbermen established the amount of the workers' compensation insurance premiums owed by Rufino's. Even though Rufino's disputes these figures, the company failed to adequately document its claim for credit. Mr. Brunson testified that the documents submitted by Mrs. Saavedra were fragmentary. The trial court also found that the documents submitted at trial to be insufficient to establish Mrs. Saavedra's claim for credit. Our examination of the documentary evidence shows that the trial court was correct in this finding. The record shows that Mrs. Saavedra had notice of the audits, and yet failed to cooperate by providing the needed information at the time of the audit. Mr. Brunson testified that he tried to meet with her on three occasions and she never appeared. The comments on the audits reflect the difficulty caused by Mrs. Saavedra's failure to cooperate with the audit process. Based upon the record before us, the trial court did not err in accepting Timbermen's audits to be accurate, based on the information the plaintiff had to work with.
As noted by Timbermen, La. R.S. 23:1196 addresses the duty of an employer to furnish necessary information to facilitate the yearly audit in connection with workers' compensation insurance premiums. Amendments to that statute, spelling out the duties of the employer, became effective August 15, 1999. That statute now provides in pertinent part:
A. Each fund established pursuant to R.S. 23:1195 shall:
. . . .
(2)(a) Conduct a premium audit annually and within four months from the termination of any employer's participation in the fund, to be conducted by an independent payroll audit firm approved by the department, or as otherwise may be approved by the commissioner.
(b) If requested, each employer shall submit a copy of state and federal reports of employee income on each employee at the end of each quarter to the fund.
(c)(i) Employers shall make available to the auditor all records necessary for the payroll verification audit, including, but not limited to, payroll records, accounting records, certificates of insurance maintained by subcontractors, and duties of employees; and permit the auditor to make a physical inspection of the employer's operation.
(ii) If the employer fails to make such records available on the date and time of an audit requested and scheduled by the auditor, and the auditor cannot complete the audit as a result, the fund may charge the employer to pay five hundred dollars to the fund to defray the costs of the audit together with reasonable attorney fees incurred by the fund in collection thereof.
(iii) If, within thirty days from written request of the auditor, the employer fails to provide reasonable access to such records or refuses to allow a physical inspection of the employer's operation, the fund may charge the employer to pay a premium of up to two times the most recent estimated annual premium together with reasonable attorney fees incurred by the fund in obtaining compliance with the required audit or in collecting such premium.
. . . .

*1194 (e) A fund may institute a civil action to enforce the obligations of the employer and collect the amount specified in Subparagraphs (b), (c), and (d) of this Paragraph. The fund shall be entitled to proceed by use of summary proceedings. The penalties provided for herein shall not be assessed unless the potential penalty and the method of imposition are disclosed in the written request to the employer required by this Subparagraph.
This statute appears to be designed to provide for specific premium audit requirements such as payroll reporting, payroll verification auditing, penalties for failure to cooperate with required audits, and penalties for intentional misrepresentations, and allows for the institution of a civil action to enforce obligations of the employer. The amendments to the statute were not in effect until August 1999. Although both parties have cited this statute in support of their positions, it was not in effect throughout the entire period in dispute. Further, Timbermen does not seek to enforce the penalty provisions of the statute; the plaintiff only seeks payment of the premiums due for 1998, 1999, and 2000.

CLASSIFICATION OF EMPLOYEES
Rufino's argues that the trial court erred in accepting the classification of the employees' duties by job trade as assigned by Timbermen. According to the defendant, the usual practice was for the auditor to request information after reviewing financial records at the accountant's office. Mrs. Saavedra claimed that, upon request, she would supply information about the classification of workers. The worker classification determines the amount of premium to be assessed to the company. Rufino's claims that it corrected the audits for the years in question and submitted the corrections to Timbermen. The defendant claims that these revisions were never questioned by Timbermen and should have been applied.
Timbermen claims that it was up to Rufino's to provide information about the classification of employees' duties by job trade at the time of the audit and that this was not done. After she received the insurance premium bill, Mrs. Saavedra merely changed the classification of employees without providing any source material to support the change. The plaintiff maintains that the trial court did not err in accepting Mr. Brunson's classification of employees.
As shown by the record, there is a conflict between the testimony of Mrs. Saavedra and Mr. Brunson as to what information was submitted by Rufino's to show that the audit report was not correct. The trial court found that Mr. Brunson was a credible witness and rejected the testimony of Mrs. Saavedra. This finding by the trial court was not manifestly erroneous or clearly wrong. The record shows that Mrs. Saavedra failed to timely submit information to establish the classification of employees. Further, the revised audit submitted to Timbermen did not provide documentation for the changes urged by Rufino's. The trial court did not err in accepting Timbermen's classifications and rejecting Rufino's arguments on this issue.

SUBCONTRACTOR RATES
The defendant argues that the trial court erred in including 100 percent of the payment made to uninsured subcontractors in computing the workers' compensation insurance premium. The insurance contract did not specify how to handle this item in calculating the insurance premium. The defendant claims that under La. C.C. art. 2053, a doubtful provision of a contract must be interpreted in light of the nature *1195 of the contract, equity, usage, and conduct of the parties before the litigation.
Rufino's contends that, regarding subcontractors without their own workers' compensation insurance, the usual practice between the parties was to include 60 percent of the amount paid to the subcontractor in computing the insurance premium owed to Timbermen by Rufino's. The company claims that Timbermen incorrectly included 100 percent of the amounts paid under the agreements with subcontractors.
Timbermen argues that it did not refuse to reduce the premium on contractors who supplied materials. However, Rufino's failed to supply requested documentation regarding the amount of materials supplied by the subcontractors. Rather, Rufino's insisted on a 60/40 split on labor and materials without any documentation. Further, Timbermen asserts that Rufino's failed to submit certificates of insurance for subcontractors who were insured.
The record shows that Mr. Brunson tried on three occasions to meet with Mrs. Saavedra to complete the audit. In each instance, she failed to appear and failed to timely submit her documentation. Further, Mr. Brunson, whose testimony was found credible by the trial court, stated that Mrs. Saavedra never provided documentation to show the amounts paid to subcontractors for labor and materials as she claimed at trial. Because of the lack of information supplied by Rufino's, all workers were placed in one category and 100 percent of the payroll was used in calculating the insurance premium. In light of Mrs. Saavedra's failure to provide adequate documentation, both for the audit and for trial, Rufino's cannot be heard to complain regarding the amounts attributed to subcontractors' work at the audit.

OPSB WORK
The defendant argues that the trial court erred in including payments to subcontractors covered by certificates of insurance under the OPSB owner-controlled insurance program. As stated above, Rufino's did some work on OPSB projects in 1999 and 2000. Subcontractors were covered by OPSB workers' compensation insurance while working on those projects. Rufino's claims that it submitted certificates of insurance to Timbermen confirming that fact. Rufino's urges that Timbermen erred in including those subcontractors on those jobs in computing the workers' compensation premium. Rufino's also points out that the 2000 audit did not include these subcontractors. Rufino's claims that this was an admission that the payments to subcontractors working on OPSB projects should not have been included in the premium calculation.
Timbermen urges that the information concerning the certificates of insurance on the OPSB projects was not presented timely. The plaintiff also argues that this is not the same as a subcontractor having its own insurance coverage. Timbermen asserts that it could have still been liable for compensation claims arising on the projects involved. It also argues that, under the documentation provided, there was no way to distinguish when a subcontractor was working on an OPSB project as opposed to other work.
Once again, this was a situation in which Mrs. Saavedra failed to comply with the standard procedures for workers' compensation insurance premium audits and failed to timely claim coverage by the OPSB for work done by the subcontractors on those jobs. Subcontractors and employees of Rufino's worked on different jobs and not just those for the OPSB. From the limited documentation submitted, Rufino's did not *1196 clearly show what portion of the amounts paid to the subcontractors was attributable solely to the OPSB projects. Therefore, we find that the trial court did not err in rejecting Rufino's claim to reduce the workers' compensation premiums owed to Timbermen.

CONCLUSION
For the reasons stated above, we affirm the decision of the trial court granting the plaintiff, Louisiana Safety Association of Timbermen Self Insurers Fund, recovery against the defendant, Rufino's Painting and Contractors, Inc., for $31,527.13 in unpaid workers' compensation insurance premiums, together with ten percent interest and $5,000 in attorney fees, subject to a credit of $5,426.26 already paid by Rufino's to the plaintiff. Costs in this court are assessed to the defendant.
AFFIRMED.